Good morning, Your Honors. My name is Lisa Cantor, and I am here on behalf of Pacific Shores Hospital, and I am splitting time with the government this morning. I'm going to try to watch so I can keep a minute for rebuttal. This is an ERISA case in which Pacific Shores Hospital, an inpatient psychiatric facility, treated Ann Knutson, who suffers from several severe mental illnesses. United Behavioral Health, the claims administrator, denied 11 days of treatment, claiming it was not medically necessary. The district court found it was not left with a definite and firm conviction that UBH's benefits determination was an error and entered judgment in favor of UBH and Wells Fargo plan. My colleague is going to address the standard of review. I would like to spend my time explaining, regardless of what the standard of review is, that the district court judgment must be reversed because UBH has abused its discretion. There are at least four ways in which UBH has abused its discretion. I would like to highlight those for you. First, Dr. Senter, who was the doctor on which the final denial was relied, and UBH both admit that they relied on the American Psychiatric Association guideline for the treatment of nuisance treatment. This guideline is the standard of care in the industry and therefore was necessary to determine whether benefits were payable within the plan definition of medical necessity. However, UBH did not produce the guideline as part of the administrative record and the trial court refused to consider the guideline when it was offered by the plaintiff to trial. Also, when you look at the denial letters, the denial letters nowhere reference this guideline and do not assess the claim in compliance with the plan language or the guideline. Let's say the plan has its own guidelines, but in the course of the review decision decides, well, let's check out and see what other sets of guidelines might say about this. That doesn't mean that they're necessarily bound by everything that's contained in an extraneous set of guidelines, does it? Well, first of all, I don't agree that these guidelines are extraneous because when you look at the, when you're looking at a claim, you have to look at the plan first. The plan has two definitions of medical necessity. First definition of medical necessity says standard of care in the industry. Second definition says UBH can look at its guidelines, so you have to look at both. The only definition of medical necessity in the industry is defined by the American Psychiatric Association guidelines. Dr. Stenter specifically says, I rely on these guidelines. I looked at them. But nowhere in her report does she analyze them. She doesn't say- Does the plan say that if the guidelines differ, that is to say standard of care in the industry and the other guidelines specific to the health plan or to this administrator, that the more expensive guideline must be adhered to or do they say that we consult both of them? Well- But they're different standards and one says this is permissible and the other one says this is not, then what? It doesn't say. What does the plan say? It doesn't say. Oh, okay. It doesn't say. That may mean that they've got discretion as to how to do that if it doesn't say. Well, I don't know that, well, here's the- You know, there's an awful lot of other evidence in this record that just is very favorable to you, so maybe, we understand your point on that one. Okay, so let's- So let's hear some more. Let me move on. Yeah. The review that UBH performed was done without obtaining any medical records. So everything was done over the phone. And when we tried to submit the medical records at trial, the district court wouldn't look at the medical records. And the problem here is that when you look at the review that Dr. Senter performed, there are a lot of errors in what she came up with. Really- Let me ask you this, counsel. As you know, they're extensive records. I think a lot of what you're talking about. But ultimately, our decision comes back to what's the standard of review here? You, of course, are fighting against the concept that all that the administrator has to show is that it's grounded on any reasonable basis. Let's put aside for a moment whether that's still the law. Is there any reasonable basis on which the decisions in this case could be grounded? Or are they all, each and every one of them, without any reasonable basis? So I have to assume for the moment that's the standard of review? Just for discussion. I'm not saying that's what it is. But at least that's the articulated standard of at least one or more of our cases. So I want to address it on that context. Assuming that's the standard for the moment, are all of the things that were done here without any reasonable basis, in fact? Yes. At the time of the denial, the denial said she was not suicidal. She was suicidal. At the time of the denial, the denial said she was medically stable. She was not medically pedaledema. She was just coming off a laxative taper, where she was taking 130 laxatives a day. And they had just gotten her off that, which is... So in other words, and I hear what you're saying, because you're my charge to confirm what you're talking about, that quite literally under any standard, this was inadequate from your perspective. There simply was no reasonable basis. Yes. The other thing I was going to say about that is that the standard that they applied was a standard they came up with mid-treatment that they came up specially because they deemed her chronic. And they came up with this because they decided because she had a lengthy history of this disease, she didn't deserve any more treatment. And there's nothing in any guideline. But they're not talking about no treatment. They're just saying that the particular setting she was in, there was no need for her to remain there. She could get the treatment she needed in a different setting. They're not just saying, back out on the street. We're done with you. That's really not an accurate presentation of the record. Let me ask you, though, about the suicidal thoughts. You said on the date of denial, she was still suicidal. I thought that there was a particular point, I can't remember where in the chronology it occurred, that her own treating doctor said, she is no longer having I don't know if it's called suicidal ideation or what the technical term is. But I thought that's what the plan had relied on, on the date that they denied any further treatment. Dr. Zucker reported from his conversation with Dr. Frederick that she was no longer suicidal. But Dr. Frederick reported in her own notes of the same day that she was still suicidal. And Dr. Zucker, just to be clear as to who's who, he's working for the defendant. Correct. So her treating doctor is Frederick. Her treating doctor is Frederick from Pacific Shores. Continued to report that she was suicidal almost until the day she discharged. The only reason she discharged, she discharged when she was able to contract for her safety. So she remained suicidal after the date of the denial. And to address your point as to no treatment, the point here is that here's a woman who is actively suicidal, threatening to starve herself to death or take Tylenol. Partial hospitalization, which is definitely day treatment, is tantamount to no treatment because she could go back to abusing her laxatives or killing herself after 5 o'clock when she's discharged. So the concern here is to get her into the kind of treatment that has 24 hour a day observation. If she was suicidal, I couldn't agree with you more. That's why I wanted to focus on, I couldn't remember the exact place on the record, but I do remember them saying, well, as of the date that we are now saying she doesn't need to be hospitalized, that her treating doctor had said as of that date, no, she was no longer suicidal. You're saying that's not correct. It was an inaccurate reporting. Got it. Well, and these things are ambiguous. If I'm suicidal today and I wake up tomorrow and I'm feeling a little better, that doesn't mean there's no danger of suicide. Correct. And when you have someone with this kind of history who is, that's another inaccurate reporting. Dr. Zucker previously reported on February 9th that she didn't have a history of suicide, but she had attempted suicide previously. Okay. You've used up all your time. We've assisted you in using up more than your time. You wanted to save a minute. We'll give you a minute in rebuttal. Thank you. But let's hear from the government. Good morning, and may it please the court. My name is Candace Phoenix, and I'm appearing on behalf of the Secretary of Labor. And I have shared my time with the plaintiff's attorney, but I would request that any remaining time be revert back to the plaintiff for her use. In this case, the plan administrator denied inpatient benefits to an 84-pound suicidal woman who was skeletal in her appearance. And under the abuse of discretion standard, that decision can't stand. Okay, let's be sure we start at the same place. My understanding is that the plaintiff has conceded that abuse of discretion is the correct standard, right? I believe so, yes. Okay. And I believe there's also a concession that there is no structural or actual conflict of interest. Is that also correct? I don't believe that that's the plaintiff's contention. The Secretary is not taking a position on the specific issue as to whether it's not. Oh, I'm sorry. I thought there was a concession to that effect. But ultimately, of course, that's what we're dealing with. We go back to Glenn, and Justice Breyer says that when we deal with ERISA, we're dealing with trust law concepts. And I gather that the Secretary wants us to clarify what is a bit of a muddled standard on the part of our court. Let's kind of start with some basics here. Is it the position of the Secretary that even if we take that any reasonable basis standard, which is the lowest and one you would like to clarify, that in this case, the plaintiff wins because there simply was an abuse of discretion? Is that correct? That's accurate. We believe that under any standard, this decision was unreasonable, but that the any reasonable basis standard should not be applied in ERISA. Okay. So you're asking us then to clarify, change, and perhaps deal with the Miller versus GAMI problem of our court in a case where, by your own concession, it's not necessary to reach the result that the plaintiff wants. Is that a fair statement? Well, it's not necessary in this particular case, but as you characterized it, the muddled case law in this circuit invites the sort of analysis that happened in the district court and is dangerous for other cases. And that's why the Secretary is appearing here. So even though it's not necessary in this case, you'd like us to use this to right the wrong of the standard? Exactly, Your Honor. The Secretary is not appearing specifically for Ms. Knutson. We believe that this has a broader based impact and that this case provides an ideal circumstance to see why all of the factors that this court has enumerated in Montour and Saloma and in other conflict cases should apply in a non-conflict case as well. And we think that the Supreme Court in Glynn has pretty much stated as much by saying that in any given case, a judge reviewing the lawfulness of benefits denials will always have to consider all the factors and circumstances in front of them. And the court specifically said that the conflict of interest or the existence of one does not change the standard of review. So the standard of review that this court put forth in Montour and other cases enumerating several factors that need to be considered in a risk of cases should have applied here and should apply in all cases whether or not there is a conflict of interest. So you review all, from the Secretary's perspective, whether or not there's a conflict of interest, you review all of the factors in a trust law context. And how would you analyze what is an abuse of discretion in that situation? Is there any particular case you would point to that you think dealt with that correctly? Well, actually, as I've mentioned already and I've said Montour a few times, that is the one that I believe is most persuasive on this point. Many of the factors that were referred for are just as applicable here even though there is not a conflict of interest. In fact, if you look at the factors this court has put forth and apply them in the way that the district court didn't even consider many of these factors, it would have come out with a different ruling, I believe. There's the quantity and the quality of the evidence that wasn't considered. You know, Judge Smith and I probably think Montour is a pretty good case. Yes, Your Honor, I would agree with that. There are several facts that this court found problematic in Montour. The fact that there was only a paper review. In this case, we didn't even get as far as a paper review. This is a game of telephone, as far as I can tell. Well, that is part of the issue, Your Honor. You understand my reference, a game of telephone? Yes. Not just telephone calls, but we know from the game of telephone, I mean, the game is the distortions that are introduced by merely passing things along by telephone. I have a preview. I have great trouble understanding how you can deny benefits based on telephone calls without any paper underlying it. You notice he didn't say, spin the bottle. It's a game of telephone. And we would certainly share that concern, Your Honor. In fact, that's one of the factors that we put in our brief, that had that been considered in this case, the district court would have come to quite a different conclusion and probably would have actually considered the excerpt of the record that it didn't allow to come in at the district court level. Can you remind me, what are the cases that you think are problematic? Because I didn't see any lack of clarity in our case law. That's why I was a little surprised, actually, that you filed the brief. It seemed to me the standard was pretty well settled. So what, again, are the cases that have kind of muddied the waters? I would point to, well, Anderson, number one, which doesn't specifically, it's a non-conflict case, but it doesn't specifically lay out what the standard of review is. Montour, which although was good in many respects, has a line in it saying that any medical opinion, a single medical opinion, can uphold the decision. And I believe that's been misinterpreted to say that even if there's a wealth of other evidence countervailing that opinion, that opinion can still I'm sure that's not what Judge Clifton meant. I would hope not, Your Honor. There's also Schneves and Saloma. Schneves lays out the any reasonable basis standard, and Saloma specifically rejects that standard for conflict cases. But it states specifically that it's only for conflict cases. It doesn't go the next step and apply it to non-conflict cases. Is it the Secretary's position, you of course are familiar with Miller v. Gammie and that we can't, as a three-judge panel, overrule another three-judge panel's decision unless there's Supreme Court law or something else that directly contradicts that case. Is it the Secretary's position that we could, if we were so inclined, provide the new clarified standard that the Secretary seeks without running into a Miller v. Gammie problem? Absolutely, Your Honor. In fact, we lay that out in our brief that it's not necessary to overturn any prior precedent. As Judge Fletcher just mentioned, that he was sure that that's not what Judge Clifton meant in writing that line in Montours. It's merely an interpretation of the prior case law to bring it into accord with this Court's decision in Abadie and the Supreme Court's decision in Glenn, stating that all relevant facts and circumstances must be considered. And just one other question. In Saloma, which admittedly involves a different factual circumstance, that adopted the Hinkson definition for abuse of discretion in a factual determination saying whether application of the correct legal standard was illogical, implausible, or without support in inferences that may be drawn from the facts and the record. Is that a qualification that the Secretary would like if we were inclined to adopt a new standard or a clarifying standard? Well, I think the Secretary would accept that definition that you just laid out with one caveat that Hinkson, I believe the case was, was in a criminal case reviewing a district court's decision and that there shouldn't be the same amount of deference granted to a third-party administrator as is granted to a district court. Right, okay. Okay, thank you. Thank you. May it please the Court, good morning. Douglas Caudill, the parent on behalf of the Appellees. I think we start with the Secretary's attempt to change the standard of review, and I have to agree wholeheartedly with Judge Watford that we don't see that there is any need for clarification of the standard of review in cases that do not involve structural conflict of interest. I agree with that, and I think the Secretary's statement is already our case law. Thank you. So I think we move on to the merits and determine whether, in this particular case, the decision by the plan here was unreasonable or illogical, incomprehensible, not based on any illegitimate ... Before you do that, do you agree that under Glenn that we should be examining what is done here on trust law concepts? Certainly ERISA plans have been guided by trust law, including ... Just as Breyer specifically says, that's what we're supposed to do, right? Correct. So, and they also talked about the fact that even though there's maybe no structural conflict, that based on the market, a company, I think this is Wells Fargo, hired the third party, an unaffiliated third party. Nonetheless, the ability of the third party to continue to be employed may be influenced by how generous it is in granting relief. Is that a fair statement? I don't think that's a fair statement, Your Honor. Okay, how would you qualify that then? I think what we have here in this particular situation is an analysis when you have no structural conflict of interest, meaning the plan is separate from the decision maker who determines whether there is benefits that are covered under the plan. And I get that. I'm simply saying as a matter of market principles that, in this case, Wells is going to continue the third party administrator if they write really generous awards, right? If they can find somebody, they'll do it for less. I don't think that's fair to ERISA plans to say that they will hire or not hire a third party administrator to make the coverage and grant them all the deference to make the decisions binding and final. Doesn't that fly against the profit motive, which is what motivates the organizations in these situations? I don't think that's a proper premise, Your Honor. That's the market. That's the real world, isn't it? In part, but it discounts companies that look into benefits for their employees, which is what the ERISA plan is. It's a benefit for their employees to get health care in this and it challenges every little step of the way and it becomes too expensive to run the ERISA plan. Then you discourage employers from granting this particular type of benefit. Well, that's part of the analysis that people undergo, but I think it's incredibly naive to assume that these folks are motivated out of some great compassion that they're going to do whatever the employee might think is reasonably necessary. I don't think you go to that extreme. Certainly there are factors that everybody takes into consideration in a profit analysis, but I don't think that plans or companies that don't have a health plan, you're not going to attract workers that you want to get if you don't have that kind of a benefit. In the analysis of assessing how much profit can we make as Wells Fargo in total, there's certainly nothing that was pointed to in this case or anything that I've seen that says, oh my God, we're going to look into what happens in a particular coverage assessment on whether somebody gets health care or not based on a TPA's analysis of that, whether they uphold a denial or not. But in effect, maybe this is not a correct analogy, but perhaps it is, Wells Fargo is going to look at all the factors to consider in terms of its employees, in terms of whether they can keep employees, attract employees, and cost, just like the government and the plaintiffs here are saying you need to look at all the totality of the circumstances of the decisions that were made here. You can't just cherry pick an individual point. You look at the totality, even if there's no structural or actual conflict, by virtue of the market play in this, it's important to consider the reasonableness of what was done under trust law concepts. Right. And I guess circling back to the beginning of your question, Your Honor, is that you're looking at what Wells Fargo does in terms of providing a benefit. And here they say, Wells Fargo said, all right, we have a plan in place for our employees. We're going to hire somebody else to administer that plan to say whether or not there is coverage under the plan criteria. We are pulling ourselves away from the analysis that could create problems if we, as the employer, were going to make that determination ourselves. And so I think it is prudent to do something like that, to have a third party come in and make the coverage assessment so that you're not in a position where you're conflicting with your employees. I understand your argument, and it's clear, I think, from the case law that we don't have in this situation what's characterized as a structural conflict. On the other hand, what Judge Smith says seems to me to make basic intuitive sense. Wells Fargo is not a charitable corporation. It's interested in making money. And if it signs off to a third party administrator who routinely and over the course of time pays out a lot more than some other third party administrator who says, listen, I'll do it for you, and I'll do it within the bounds of the law, I don't think Wells Fargo is going to pay attention to its shareholders if it says we're willing to pay an extra $10 million a year to this third party administrator when the other one is going to save us that money. I think I'm just stating what's obvious factual stuff. But your point, I think, is also valid. This does not rise to the level of what the law calls a structural conflict. Correct. In a sense, I think you're both right. I have to disagree with you, Judge Fletcher. In terms of how you're assessing what Wells Fargo is doing or not doing, and that you look and say, we're going to make more money if we go out there and deny claims willy-nilly. I did not say that. Okay, well, I apologize for being hyperbolic. But if you look at a plan that says we're going to make more money if we hire a TPA, a third party administrator, who summarily denies claims or denies claims at an unreasonable rate, then you get into the situation. I didn't mean to use that. But if you're, again, if you're looking at, I think I misunderstood your point, Your Honor, because... Why don't we move on to the actual facts of this case? All right. Because you've got some problems defending what happened here. I don't think so, Your Honor. I think we have to look at what was before, what was before the claims administrator in reviewing, what was before Dr. Zucker. Yes, there is a lot of accusation about, oh, the administrator in Dr. Zucker ignored the fact that she was suicidal. She had suicidal ideations, and she had for a long time. There's no dispute about that. Dr. Zucker, however, clarified that she did not have a plan, and that's the criteria... That's not quite right. What Dr. Zucker said, or concluded, based on a telephone conversation, and I think on this point, if I state it this way, accurately, that she had not assembled the means to commit suicide. But of course, she's in the hospital. How can she do that? Well, again, you're looking to what was done in this case with her. She's getting better. She in 2007 had a plan to overdose on Tylenol, to overdose on laxatives, and then three years later she gets admitted into Pacific Shores when she had a similar threat that, I'm going to overdose, and I'm going to commit suicide. Is it correct that Dr. Zucker was under the impression that she had not previously attempted suicide? He was mistaken, but... And he was mistaken based on, I mean, where did that mistake come from? And why did he make that mistake? That he was unaware of, or didn't state, the 2007 attempt? Yeah, he seems to have been unaware of it. Well, you have a situation where in, at the time, after three weeks of treatment, she was not suicidal, and suicide... I'm asking a different question. Why was Dr. Zucker under the impression that she had not previously attempted suicide? I don't think there's any evidence in the record that would show what was in his state of mind at the time, whether it was an omission, whether it was... Well, what's in his state of mind is he doesn't know it, and I'm asking you, why didn't he know it? It wasn't stated in his notes. I don't know that that equates with him not knowing, Your Honor. He may have made a mistake in terms of what he transcribed in his notes. What I'm driving at is this telephone business. I mean, Dr. Zucker makes his decision based on telephone conversation. Dr. Senter makes her decision based, or comes to her conclusion, based on telephone conversation. I mean, I don't want people making medical decisions over the mildest treatment for me, based upon telephone conversations, no follow-up with a piece of paper. The errors that are introduced here are rife, particularly when you get to Dr. Senter, the third party after which they refer, and then they rely on for the denial. I see no excuse for doing this by telephone, and it just shows up then in the consequences how many mistakes Dr. Senter made and the mistakes that Dr. Zucker made. They just didn't understand what was going on. The third party administrator is not making a medical determination. What they're doing is making a coverage determination. What's the difference in this case between a medical and a coverage determination? Because in this particular case, there was an admission into Pacific Shores. There was communications, ongoing communications. There was follow-up with the care advocate on numerous occasions to get the status of Ms. Knutson and determine where she was, how she was doing, was she getting better? Could she be treated? Because the plan requires not only medical treatment, but it requires treatment at the appropriate level of care. If you're going to be in-hospital, inpatient, at an acute 24-hour being-watched hospital all the time, that doesn't necessarily mean that you're getting better care than you would at a partial hospitalization level of care where Ms. Knutson was approved to go as a step down. All of the treating physicians at Pacific Shores Hospital thought that she needed the level of care that she was getting at that facility. The only people who disagreed were Dr. Zucker and Dr. Center, and they disagreed on misunderstandings of the facts. Not completely, Your Honor. You have a significant number of facts that go into the equation, into the determination as to whether or not there was an abuse of discretion here. In addition to the suicidal ideation that did not have a plan in place, and Dr. Zucker talked to the Pacific Shores treating physician and found out more facts about the suicidal ideation and the fact that she did not have a plan in place, and that she did not have a credible course of committing suicide. At that time, because she's in the hospital. No, because she's getting better, Your Honor. She's been there. She's treating. She wants to get out. She needs to go home to take care of her family and her daughter who's going to college. Her husband lost her job. She wanted to get out of the hospital. Wait a minute, this is all of a sudden sounding as though the hospital is confining her against her will. Is that what the record shows? Not saying that the hospital was confining her against her will. Well, you're telling me she wants to go home. She wants to go home because she wants to get back to work. She wants to be by her family in Minnesota. Okay, so I'm asking you again. Are you telling me that the hospital is keeping her against her will? No, I'm not telling you that, Your Honor. But what I'm telling you is that there are other factors that go into the reasonableness of the decision, and when you look at suicidal ideation, she's going to a place where she could get overnight stays if there are issues, and they're not throwing her out. What was her weight at discharge? She was 83 or 84 pounds, depending on the exact day. So more or less the weight that she had when she was admitted. She was about eight pounds heavier than when she was admitted. And the significance of it is three. Are there some evidence that she was 88 when she came in? I don't have evidence as to what her weight was. It varies a little bit. Well, she went down to 78, I thought. But what I'm driving at is the initial plan proposed by your client was that she should be kept until she comes back up to 85 percent of her ideal body weight, which would be about 105 or 106 pounds. Then on 2-12, apparently your client says she should be discharged only when she comes back up to 75 percent of ideal body weight, which is about 90 to 95 pounds. And she's discharged well below that weight. Well below the weight that your client says was the ideal weight. How do you explain that? I know it's out of time. May I answer your question? Go ahead, please. First of all, she wasn't being discharged from medical care. She was being afforded the step-down. I understand that. But what I'm saying is that your client said she should not be discharged from this form of hospital treatment until she reached 85 percent. And then later they reduced that to 75 percent. But then she's released at at least 10 pounds below the 75 percent. How do you explain that? Yeah, 10 percent below. She was released at about 66 percent of her ideal weight. So how do you explain that? And again, and again. That's against your own client's recommendation as to when she should be released. Again, you have to look at the totality of the circumstances involving when she came in. This is the ideal plan for somebody to go out at 85 percent of their ideal weight. You look at what happened to Ms. Knutson here. When she came in, she was ingesting 200 calories a day. When she was done with the three weeks, she was between 1,500 and 2,100 calories per day. But she was not gaining weight at, if I eat 2,100 calories, I gain a lot of weight. She didn't. I know all this, but you're not answering my question. It may be because you don't know the answer. And frankly, I don't know the answer. But I'm looking at your client's statement as to when she should be eligible for discharge from this treatment. It starts out, she should not be discharged from this level of treatment until she reaches 85 percent of IBW. That then changes on the 22nd of February. Your client says she should not be discharged until she reaches 75 percent of IBW. Your client then insists a very few days later that she be discharged, even though she's at 66 percent. I'm trying to figure out how that can be consistent with not abusing discretion, and I've not heard an answer from you. I'm trying to get there. Although there's an ideal plan when somebody comes into the hospital. This is not proposed as an ideal plan. This was the plan that your client said, this is what has to happen before she can be safely discharged. But if she gets to that point, Your Honor, and again, she's not getting any medical care or somebody watching her while she eats so that she can progress along the road to recovery. But at 66 percent of her ideal weight, after three weeks of in-hospital treatment, when she's not gaining weight, she wouldn't get out for who knows how long. If she's at a stage in her progress that she should be able to go at the next, the partial hospitalization level of care and continue getting better, then that's what's appropriate under the plan. And she, otherwise she would be held against her will. I think I heard you say then that if we're to try to figure out whether there was an abuse of discretion, we shouldn't just consider the circumstance as to what the initial recommendation was. We should consider all the circumstances in deciding whether or not there's been an abuse of discretion. Your Honor, what you're saying, no, no, what I'm saying is when she came in at the outset, you look to a plan. And again, medical treatment, especially in this area of anorexia nervosa, is the practice of medicine at its highest. Because you don't know how different treatments are going to work for individuals. And here you had a treatment that was getting this Ms. Knutson better. And yes, she did not have an 85 or even 75 percent of her ideal weight at the time she left Pacific Shores. But she had gotten better. She had. How can you say that? Look, the record is complete with, you know, the contrary, that she wasn't getting better. You know, that just seems like nonsense to me. I mean, everything that you're just now saying was refuted by the folks at Pacific. Who do we believe here? I mean, obviously, this is where the level of scrutiny comes in, what we look for in a trust-type relationship. Here people say one thing, they say another. It's the telephone thing. I don't think it's the telephone thing, Your Honor. What Dr. Zucker was relying on was a report that she was no longer abusing laxatives, that she had completely titrated off that. But yes, she did have some medical issues, the pancreatitis, the other issues. But there's nothing in the record to show that it was inappropriate to treat those problems that she still had. And admittedly, she still had problems, which is why the plan agreed, you know, or approved the partial hospitalization level of care. No, she wasn't completely healed. It wasn't a situation where she came in three weeks later. The plan says, you're healed, you're gone. No, this is, you're getting better, you're improving. You don't have the laxative issue that you had, which was significant. You don't have the caloric intake problem that you had, which was significant. Perhaps that was an access issue. She didn't have access to the laxatives. But then, Your Honor, when do you discharge somebody? Because they can always have that problem. They can always say, I need to take, I need to go find laxatives. You can say that, but you can't also say she's getting better, necessarily. I'm not sure we're going to get the result. No, I think we've got your position pretty well. Thank you. Thank you. We took Mr. Calabro several minutes over. Please put two minutes on the clock. Thank you. I'd be happy to answer any questions the panel may have. And I just wanted to say that there has not been a decision of this court addressing the standards specifically for eating disorder patients. And- Do we need a separate standard? We don't, Your Honor, but if you'd forgive the play on words, this is a chronic problem for people who suffer from severe mental illnesses and eating disorders in particular. As far as the standard under ERISA, though, wouldn't it be really futile for us to try to take subcategories of medical problems and be involved? We're not scientists. We're not doctors. We need to have a clearly understandable standard so that under any plan, the administrators, others involved will know on what basis their decisions will be reviewed. Isn't that really what we're looking for? Yes, Your Honor. All I'm saying is that a published decision that discusses the issues and facts of a case like this would go a long way towards teaching ERISA fiduciaries how they're supposed to behave on similar facts with eating disorder patients. There isn't one. And if there were one, maybe insurers and claims fiduciaries would understand what the standards are. The failure to get medical records is common. The telephone tag is common. And it's a problem that's affecting those with severe mental illnesses every day. Thank you. Thank you both sides for your arguments. Pacific Shores Hospital versus United Behavioral Health and Wells Fargo and Company Health Plan now submitted for decision.
judges: Fletcher, Smith, Watford